CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAIL-
ROAD CO., Respondent, v. HARMON, Secretary of
State, Appellant.

(No. 6,705.)

(Submitted December 9, 1930. Decided January 17, 1931.)

[295 Pac. 762.]

*Mr. L. A. Foot,* Attorney General, and *Mr. T. H. MacDonald,* Assistant Attorney General, for Appellant, submitted a brief; *Mr. L. V. Ketter,* Assistant Attorney General, argued the cause orally.

*Messrs. Murphy & Whitlock* and *Mr. H. H. Field,* of the Bar of the State of Illinois, for Respondent, submitted a brief; *Mr. Field* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The plaintiff, a Wisconsin corporation, having paid under protest certain fees demanded of it by the secretary of state, upon the filing of its first annual report, as required by law,

brought action to recover the amount so paid. To the complaint filed, the defendant interposed a demurrer, which was overruled, and thereupon the defendant answered, admitting the facts alleged, but raising questions of law. A demurrer to this answer was sustained, and judgment in favor of the plaintiff followed. Defendant has appealed from the judgment.

The fees in suit were demanded pursuant to the provisions of Chapter 95, Laws of 1925, which are, in part, as follows:

"Section 1. That every foreign corporation required by law to file in the office of the Secretary of State a certified copy of its charter or articles of incorporation shall pay to the Secretary of State for the filing thereof as follows: Upon the proportion of its authorized capital stock then or thereafter to be represented by its property and business in Montana. * * * " Here follows a schedule of rates with a minimum fee fixed at $50.

"Section 2. Every foreign corporation which is required by law to file in the office of the Secretary of State a certified copy of its charter or articles of incorporation shall annually and between the first days of January and March of each year file in said office a report * * * stating the proportion of its authorized capital stock represented in the State of Montana by its property located and business transacted therein during the preceding year."

Section 3 provides the manner of computing the authorized capital stock employed in this state.

"Section 4. Whenever such report shall show a greater proportion of the authorized capital stock * * * represented by its property and business in Montana than that upon which the fee for filing was based, such foreign corporation at the time of filing such report, shall pay such additional fee as it would have been required to pay for filing if such fee had been calculated" at the time of filing its articles.

The undisputed allegations of the complaint are as follows: The plaintiff filed a certified copy of its articles of incorporation in the office of the secretary of state in June, 1927, and paid a filing fee of $50. Its authorized capital stock then, and at all times herein mentioned, aggregated 5,021,721 shares, of which 2,923,804 were preferred stock of a par value of $100 per share, and 2,097,971 were common stock of no par value. At the time of filing its articles, plaintiff owned no property in, and was transacting no business within, the state of Montana, but at the beginning of the following year it acquired all of the property of the Chicago, Milwaukee & St. Paul Railway Company, a complete railway line extending from Chicago to Seattle, fully equipped, and thereafter operated the railway and engaged in both interstate and intrastate business within Montana.

In February, 1929, plaintiff filed with the secretary of state its first annual report, as required by Chapter 95, Laws of 1925, above, containing all the information thereby required. This report shows that less than half of the plaintiff's "authorized stock" had been theretofore issued. On filing the report, plaintiff tendered to the secretary of state a filing fee of $5, which was refused; demand being made for the payment of $7,705.57, being the "additional fee" for which provision is made in section 4 of the Act above, computed as required by section 3, less the $50 fee paid at the time of filing plaintiff's articles of incorporation. In order to avoid the penalties provided by section 6 of the Act, on failure to pay such "additional fee," plaintiff paid the full amount demanded, under protest, and commenced this action to determine the validity of the charge made.

It is conceded that the fee is correctly computed and was due at the time it was paid, provided the state can lawfully impose such a fee upon this plaintiff; in other words, Is Chapter 95, Laws of 1925, a valid enactment with respect to the plaintiff corporation, or, as to plaintiff, is it void by reason of

some contravening prohibition of the Constitution of the United States, on which plaintiff is entitled to rely?

The position of defendant is that the fee demanded was but an "entrance fee" payable for the privilege of coming into the state for the transaction of business, analogous to that considered in *People ex rel. D. W. Griffin, Inc.,* v. *Tax Commission,* 249 N. Y. 369, 164 N. E. 253, as to which class of fees, as distinguished from a franchise or excise tax, the measure of the burden rests in the discretion of the state, under the ruling in *Hanover Ins. Co.* v. *Harding,* 272 U. S. 494, 49 A. L. R. 713, 71 L. Ed. 372, 47 Sup. Ct. Rep. 179, 182.

While our statute bears some analogy to that considered in the *Griffin Case,* there is a marked distinction between the two. The New York statute clearly provides for an "entrance fee" based on the percentage of the stock of a corporation "employed in the state," the amount of which is determined by the volume of business done during the first year after entry, but a single fee, the computation of which is, for the purpose of intelligent action, deferred for the period of one year.

Here plaintiff's articles of incorporation were filed pursuant to the mandate of section 6651, Revised Codes 1921, and, at the time of such filing, plaintiff's "entrance fee" was due and payable and was paid. Had the property and business conditions of the corporation remained without change, no further fee would have been exacted under the provisions of Chapter 95, Laws of 1925. The fee protested is, as designated in the Act, an "additional fee" to be computed and exacted whenever an annual report of a corporation doing business in the state shows an increase in property owned and business done within the state. It is, in its nature, no different from the fee for which provision was made in section 165, Revised Codes 1907, on the filing of a certificate of increase in capital stock, or in case of alteration or amendment of the charter or articles of incorporation of any foreign corporation doing business in this state, or of increasing its capital stock, or continuing its corporate existence (sec. 4413, subd. 7, Rev. Codes 1907).

It differs from the ordinary franchise or annual tax, in that it is added to the original "entrance fee" and is in the nature of a condition subsequent imposed upon a foreign corporation at the time of its entry, which may or may not thereafter attach.

However, we deem it unnecessary here to determine whether the fee exacted should be classed as an admission fee, a franchise fee or an annual fee. It is true that, in the *Hanover Insurance Co. Case,* although the fee there considered was an annual tax on "net receipts," Mr. Chief Justice Taft indulged in certain pronouncements respecting the right of a state to exercise its discretion in declaring on what conditions it would permit a foreign corporation to enter its jurisdiction. These pronouncements are based upon the following general principles:

A corporation, being but a creature of statute, can have no actual existence outside the state of its creation (*Augusta Bank* v. *Earle,* 13 Pet. 519, 10 L. Ed. 274), and can do business in a sister state only by reason of comity between the states (*American Christian Union* v. *Yount,* 101 U. S. 352, 25 L. Ed. 888). It is not a "person," within the meaning of section 2, Article IV, of the Constitution of the United States, the privilege and immunity clause (*Pembina Min. Co.* v. *Pennsylvania,* 125 U. S. 181, 31 L. Ed. 650, 8 Sup. Ct. Rep. 737); and, while it is considered a person or citizen within the meaning of the equal protection clause (sec. 1, Fourteenth Amendment), it cannot invoke the equal protection clause until after it has been duly admitted to do business in the state (*Blake* v. *McClung,* 172 U. S. 239, 43 L. Ed. 432, 19 Sup. Ct. Rep. 165). Therefore, generally speaking, with reference to the position of the corporation only, a state may exercise its discretion in either excluding foreign corporations of a given class, or imposing conditions upon its admission which the corporation must meet or forego its intent to enter the state for the purpose of conducting business therein. (*Waters-Pierce Oil Co.* v. *Texas,* 177 U. S. 28, 44 L. Ed. 657, 20 Sup. Ct. Rep. 518;

8

*People of the State of New York* v. *Roberts,* 171 U. S. 658, 43 L. Ed. 323, 19 Sup. Ct. Rep. 70.)

However, as stated by the learned Chief Justice in the *Hanover Insurance Co. Case,* on which the defendant relies: "There is a very important qualification to this power of the state, the recognition and enforcement of which are shown in a number of decisions of recent years. That qualification is that the state may not exact as a condition of the corporation's engaging in business within its limits that its rights secured to it by the Constitution of the United States may be infringed. This is illustrated in respect to the breach of the commerce clause of the Constitution by the cases of *Sioux Remedy Co.* v. *Cope,* 235 U. S. 197, 203, 59 L. Ed. 193, 35 Sup. Ct. Rep. 57, and *Looney* v. *Crane Co.,* 245 U. S. 178, 188, 62 L. Ed. 230, 38 Sup. Ct. Rep. 85, * * * in cases in which the state has vainly attempted to subject foreign corporations to a payment of a tax which is a tax, not only on the property of the corporation in the state, but also on its property without the state, in violation of the due process of law clause of the Fourteenth Amendment (*Western Union Tel. Co.* v. *Kansas,* 216 U. S. 1, 54 L. Ed. 355, 30 Sup. Ct. Rep. 190; *St. Louis Cotton Compress Co.* v. *Arkansas,* 260 U. S. 346, 67 L. Ed. 297, 43 Sup. Ct. Rep. 125) ; * * * the question of the application of the equal protection clause turns on the stage at which the foreign corporation is put on a level with domestic corporations in engaging in business within the state."

In Corpus Juris it is said: "Only two exceptions or qualifications have been attached to the power of a state to exclude foreign corporations from coming into the state and doing business there. One of these qualifications is that the state cannot exclude from its limits a corporation engaged in interstate or foreign commerce, * * * the other * * * where the corporation is an agency or instrumentality in the employment of the federal government." (14A C. J. 1248.)

As Congress is vested with the power to regulate interstate commerce, a corporation authorized on its creation to engage

in such commerce cannot be excluded from another state than that of its creation; nor may a state in any way tax, regulate, or restrict the operations or instrumentalities of such a corporation where to do so would amount to a direct burden upon interstate commerce. (*Looney* v. *Crane Co.*, above.)

Further, the right to exclude or regulate does not extend to support a statute which, in its operation, deprives a foreign corporation of its property without due process of law. (*National Council* v. *State Council*, 203 U. S. 151, 51 L. Ed. 132, 27 Sup. Ct. Rep. 46.)

These qualifications, of course, do not affect the right of the state to impose upon a foreign corporation, for the privilege of entering the state for business purposes, an entrance fee based on the local or intrastate business it may thereafter do, or an excise tax based on such business, provided the law does not lay a burden on the interstate business of the corporation or seek to tax property lying without the state. (*Western Union Tel. Co.* v. *Kansas*, 216 U. S. 1, 54 L. Ed. 355, 30 Sup. Ct. Rep. 190; *Postal Tel. Co.* v. *Charleston*, 153 U. S. 692, 38 L. Ed. 871, 14 Sup. Ct. Rep. 1094.)

Originally, our legislature made provision only for an "entrance fee" to be paid by all corporations, foreign or domestic, filing articles of incorporation with the secretary of state, based upon the amount of "capital stock" shown in the articles filed, and similar fees to be paid on filing certificates of increase in capital stock. (Sec. 165, Rev. Codes 1907.) Section 4413, above, existed concurrently with section 165, above, and is now section 6651, Revised Codes 1921.

In 1913, basing its decision upon a number of opinions of the supreme court of the United States, chiefly that in *Western Union Tel. Co.* v. *Kansas*, above, this court held section 165, Revised Codes 1907, invalid in so far as it affected foreign corporations engaged in interstate commerce, as violating both the commerce clause and the due process clause of the federal Constitution (*Chicago, Milwaukee & St. Paul Ry. Co.* v. *Swindlehurst*, 47 Mont. 119, 130 Pac. 966); but later, relying upon

the decision in *Baltic Min. Co.* v. *Massachusetts*, 231 U. S. 68,
58 L. Ed. 127, 34 Sup. Ct. Rep. 15, held the section valid as to
foreign corporations seeking to engage in strictly intrastate
business in this state (*State ex rel. General Electric Co.* v.
*Alderson*, 49 Mont. 29, 140 Pac. 82). To meet the situation
thus disclosed, the legislature enacted Chapter 37, Laws of
1915 (carried forward as section 145, Revised Codes 1921),
which provided the method of computing the entrance and
additional fees to be paid by foreign corporations adopted in
Chapter 95, Laws of 1925, with the important difference, here-
inafter discussed, that it provided for computation on the basis
of "capital stock" instead of "authorized capital stock," but
the legislature failed to change the law as it existed with ref-
erence to the filing of certificates of increase in capital stock.
The validity of this provision as to increase of capital stock by
a foreign corporation engaged in intrastate business in this
state was next challenged, and, finding that since the decision
in the *Alderson Case* the supreme court of the United States
had receded from its pronouncement in the *Baltic Mining Co.
Case*, this court overruled the Alderson decision and held that
section 165, Revised Codes 1907, was invalid as to foreign cor-
porations engaged in interstate and intrastate business and
having only a portion of its capital stock represented by prop-
erty owned and business done in this state; the basis of the
decision being the contravention of the commerce and due
process of law clauses of the federal Constitution. (*J. I. Case
Co.* v. *Stewart*, 60 Mont. 380, 199 Pac. 909, 911; *General Elec-
tric Co.* v. *Stewart*, 60 Mont. 387, 199 Pac. 911.) This latest
pronouncement of our court is in accord with the later deci-
sions of the United States supreme court, in which the Baltic
Mining Company opinion has now been definitely disapproved
in so far as it "tends to support a different view." (*Alpha
Portland Cement Co.* v. *Massachusetts*, 268 U. S. 203, 44 A. L. R.
1219, 69 L. Ed. 916, 45 Sup. Ct. Rep. 477, 481; *Cudahy Pack-
ing Co.* v. *Hinkle*, 278 U. S. 461, 73 L. Ed. 454, 49 Sup. Ct.
Rep. 204, 206.)

Not only our decision, but this latest federal decision, was written concerning Acts providing for the so-called "entrance fee," computed on capital stock, without regard to the proportion of property owned, or business done, by the foreign corporation, in the state. Therefore, while the equal protection clause of the federal Constitution may not be a bar to the laying of this class of tax, clearly the due process clause and the commerce clause thereof forbid the exaction of a fee for the privilege of entering the state for the purpose of transacting local business if the Act either imposes a burden on interstate commerce or seeks to tax property beyond the confines or jurisdiction of the state.

It has been held that, although the total capital stock is made the basis for computing the entrance fee, the validity of the Act is saved when the prescribed fees do not vary in direct proportion to the amount of capital stock and a maximum fee is fixed, which the court cannot say is "wholly arbitrary or unreasonable." (*General Railway Signal Co.* v. *Virginia*, 246 U. S. 500, 62 L. Ed. 854, 38 Sup. Ct. Rep. 360, 361.) However, the decision is based, in part, on the Baltic Mining Company decision, and the court stated: "It seems proper, however, to add that the case is on the border line. See *Looney* v. *Crane Co.*, 245 U. S. 178, 62 L. Ed. 230, 38 Sup. Ct. Rep. 85, *International Paper Co.* v. *Massachusetts*, 246 U. S. 135, 62 L. Ed. 624, 38 Sup. Ct. Rep. 292 [Ann. Cas. 1918C, 617], and *Locomobile Co.* v. *Massachusetts*, 246 U. S. 146, 62 L. Ed. 631, 38 Sup. Ct. Rep. 298."

In considering a Washington statute providing for both a filing fee and a license tax "reckoned" upon its *authorized* capital stock, as here, the fact that the statute fixed a maximum fee was brushed aside and the Act declared violative of the commerce clause; the court declaring "the amount demanded is unimportant when there is no legitimate basis for the tax." (*Cudahy Co.* v. *Hinkle*, above.)

In *International Paper Co.* v. *Massachusetts*, 246 U. S. 135, Ann. Cas. 1918C, 617, 62 L. Ed. 624, 38 Sup. Ct. Rep. 292,

294, the declarations of the supreme court of the United States on this subject are summarized as follows:

"1. The power of a state to regulate the transaction of a local business within its borders by a foreign corporation—meaning a corporation of a sister state—is not unrestricted or absolute, but must be exerted in subordination to the limitations which the Constitution places on state action.

"2. Under the commerce clause exclusive power to regulate interstate commerce rests in Congress, and a state statute which either directly or by its necessary operation burdens such commerce is invalid, regardless of the purpose with which it was enacted.

"3. Consistently with the due process clause, a state cannot tax property belonging to a foreign corporation and neither located nor used within the confines of the state.

"4. That a foreign corporation is partly, or even chiefly, engaged in interstate commerce does not prevent a state in which it has property and is doing a local business from taxing that property and imposing a license fee or excise in respect of that business, but the state cannot require the corporation as a condition of the right to do a local business therein to submit to a tax on its interstate business or on its property outside the state. * * * "

Up to 1924 the state of Ohio had statutory provisions on this subject very similar to those of Chapter 95, Laws of 1925, above; these provided for an initial fee to be paid on entering the state, annual reports and for the payment of an "annual fee" for the privilege of exercising its franchise in the state "in addition to the initial fee * * * computed upon the proportion of its authorized capital stock of the corporation represented by the property owned and used and business transacted in this state." Applying the above-quoted declarations in condemning the Ohio law, the supreme court of the United States said: "The inevitable effect of the Act is to tax and directly burden interstate commerce of foreign corporations permitted to do business in Ohio, and engaged in inter-

state commerce, wherever the number of shares authorized, subject to the charge * * * exceeds the number of outstanding shares attributable to or represented by the corporation's property and business in that state." (*Air-Way Corp.* v. *Day,* 266 U. S. 71, 69 L. Ed. 169, 45 Sup. Ct. Rep. 12, 14.)

It is true that the tax under consideration in the last case cited was an annual or franchise tax, and therefore the opinion was finally based on a violation of the equal protection clause of the Constitution, but what is there said concerning the violation of the commerce clause is in harmony with the declarations found in the decision heretofore considered, dealing with the initial or entrance fee, and is applicable here.

In upholding the New York Act, considered in the *Griffin Case,* above, the supreme court of the United States, referring to the *Air-Way Case,* points out that a tax computed upon the *authorized* shares, whether or not subscribed for or issued, has no relation to the value of the privilege enjoyed, and said: "But the computation of the present tax is not * * * based upon the mere authority of the corporation to issue stock, a privilege conferred by another state and not fully exercised. Instead it is calculated on the number of shares of stock actually issued and used by the corporation in carrying on its business within the state." (*New York* v. *Latrobe,* 279 U. S. 421, 73 L. Ed. 776, 49 Sup. Ct. Rep. 377, 379.) So likewise the number of shares into which the authorized issued and unissued stock is divided has no relation whatever to the value of the property of the corporation or the business transacted by it. (*Farrington* v. *Mensching,* 187 N. Y. 8, 10 Ann. Cas. 101, 10 L. R. A. (n. s.) 625, 79 N. E. 884; *People* v. *Walsh,* 202 App. Div. 651, 195 N. Y. Supp. 184.) Unissued stock "merely represents the right to admit new stockholders, and has no value in itself." (5 Thompson on Corporations, 3d ed., sec. 3445; Wood on Modern Business Corp. 118.) Each outstanding share represents an aliquot part of the corporation's assets, but unissued shares may never be subscribed and are not a reasonable measure of the fee; "such shares may

never be subscribed or issued, or additional shares may be issued to acquire property or do business in other states or to carry on interstate commerce." (*Air-Way Corp.* v. *Day,* above.)

The Act of 1925, with respect to corporations in the class to which plaintiff belongs, is invalid.

The attorney general invokes the rule that one not hurt by statute cannot challenge its constitutionality, but we fail to perceive the application of the rule to the case at bar. Such a rule was applied in *Roberts & Schaefer Co.* v. *Emmerson,* 271 U. S. 50, 45 A. L. R. 1495, 70 L. Ed. 827, 46 Sup. Ct. Rep. 375, but the court did so because all of the *authorized* stock of the corporation plaintiff had been issued. Here only a part of the corporation's authorized stock has been issued, as appears from the report on which the state acted.

Defendant argues that plaintiff complains of but a theoretical discrimination, because the "Montana proportion of the authorized stock is but $36,922,854.36," while the Montana proportion of property owned, represented by issued stock, "is $52,056,579.00." These two items are but factors, with others, in the equation producing the fee to be collected. The statute requires the computation to be made on the percentage of the authorized capital stock employed in the state, given in plaintiff's report as 9.29 per cent thereof, which computation clearly resulted in a demand for a fee far in excess of the fee payable on the basis of the issued shares of stock, which computation would be permissible under the Act considered in the *Griffin* and *Latrobe Cases,* cited above.

It has been suggested that we now hold the plaintiff liable ██ under the Act of 1925 for a fee computed on the basis of the issued stock shown in the report before us, but we cannot legislate, and, under the statute, no justification for such computation exists. (*O'Gara Coal Co.* v. *Emmerson,* 326 Ill. 18, 156 N. E. 814.)

However, a further question presents itself for our consid- ██ eration; i. e., Does the fact that the law under which

the plaintiff paid the fee demanded has been declared unconstitutional enable plaintiff to evade the payment of any fee and entitle it to a return of the full amount of the fee so paid? As the exaction of a fee is purely a matter of statutory requirement, this would be the result if, at the time of filing plaintiff's report, there was no valid existing law requiring the payment of a fee, but not otherwise.

We have already commented on the Act of 1915, passed to meet the situation disclosed by the decisions of this court. This Act was, in effect, approved in the J. I. Case Company decision, wherein Mr. Justice Holloway, speaking for the court, said: "A statute may escape condemnation if it imposes the tax only upon the proportion of the total capital stock represented by the property and business in the state." For some unknown reason, the legislature of 1921, in spite of the declarations contained in our decisions, "amended" section 165, Revised Codes of 1907, and repealed Chapter 37, Laws of 1915 (Chapter 91, Laws of 1921). This Act was, in its essential details, identical with the original section 165, and open to the full condemnation meted out to it, in so far as it applied to foreign corporations engaged in interstate commerce, although otherwise still valid. Realizing its mistake, however, the legislature at its next session enacted Chapter 132, Laws of 1923, which is modeled after the Act of 1915, and differs therefrom only in the rate of the fee fixed and in providing that "all foreign corporations which have entered Montana * * * subsequent to February 27, 1915, * * * shall pay only upon the actual amount of increase in proportion of capital employed in Montana" (sec. 4), and in the addition of section 5, "That from and after the passage of this Act no foreign corporation shall be permitted to enter the State of Montana for the transaction of business, where such foreign corporation has capital stock of no par value."

Chapter 95, Laws of 1925, above, expressly declared the repeal of the Act of 1923, and thereupon re-enacted its provisions, inserting the word "authorized" before "capital stock"

wherever the latter term appeared, and, in lieu of section 5, quoted above, provided that, "if a foreign corporation has capital stock of no par value, its shares, for the purpose of estimating the amount of fees to be paid hereunder, shall be considered to be of the par value of $50.00 per share." (Sec. 5.)

Clearly, the legislature intended to continue the policy of exacting an entrance fee and additional fee from foreign corporations and that Chapter 95, Laws of 1925, should supplant Chapter 132, Laws of 1923, only as a valid enactment and that the latter should become inoperative only upon the former's becoming operative, and did not intend the repealing clause of the former to effect the repeal of the latter, regardless of the validity of the former.

As the new Act is unconstitutional in its effect upon corporations of the class to which plaintiff belongs, and its repealing clause is in the ordinary form, the Act, for the purposes of this decision, is as though it had never been enacted, and the repealing clause falls with it. (25 R. C. L. 913; *State* v. *Rice,* 115 Md. 317, Ann. Cas. 1913A, 1247, 36 L. R. A. (n. s.) 344, 80 Atl. 1026; *Fesler* v. *Brayton,* 145 Ind. 71, 32 L. R. A. 578, 44 N. E. 37.)

The unconstitutionality of the Act of 1925 does not repeal, modify or affect, in any way, the Act of 1923. (*People ex rel. Farrington* v. *Mensching,* above.) The Act of 1923 is still in effect and applicable, if its constitutionality can be declared. This Act provides for a fee computed on the proportion of the "capital stock" of the corporation employed in the state, which provision takes into consideration only par value stock.

The word "stock," as applied to corporations, means the property and franchises of the corporation. It is sometimes used to designate the certificates issued to stockholders, but this is an inappropriate use of the term. (*Williams* v. *Western Union Tel. Co.,* 48 N. Y. Super. Ct. 349.)

The difference between the Act of 1923 and that of 1925, the one using ''capital stock'' and the other ''authorized capital stock,'' is made clear by a brief consideration of the discussion of what is capital stock, found in 5 Thompson on Corporations, third edition, section 3411, and the many cases therein cited. It is there said: ''There is a wide distinction between the authorized capital stock of a corporation and its actual capital stock. While the authorized capital may never become actual capital, for obvious reasons, yet the actual capital stock is the amount of the authorized capital that has been bona fide subscribed and paid in. * * * An approved definition of capital stock is that it is the fund employed in the carrying on of some business or enterprise, divided into shares of equal amounts and owned by individuals who jointly form a corporation, * * * it does not include unissued but authorized shares.'' And again: ''It must be borne in mind that the mere fixing of the amount of the capital stock in the articles of incorporation does not, in fact, create capital stock; at most it is a mere designation of what the capital stock may or shall be. In this form it is no more than a potentiality.''

The capital stock of a corporation embraces the entire property of the corporation, represented by issued certificates of stock, each of which represents an aliquot part of the entire assets of the corporation, or basis of its business and means of conducting its operations. (*Farrington* v. *Tennessee,* 95 U. S. 679, 24 L. Ed. 558; *Memphis & C. R. Co.* v. *Gaines,* 3 Tenn. Ch. 604; *People* v. *Roberts,* 66 App. Div. 157, 72 N. Y. Supp. 950; *Sturges* v. *Carter,* 114 U. S. 511, 29 L. Ed. 240, 5 Sup. Ct. Rep. 1014.)

When, therefore, the Act of 1923 (section 1) declared that every foreign corporation shall pay a fee computed upon the ''proportion of its capital stock then or thereafter to be represented by its property and business in Montana,'' it evaded the condemnation visited upon section 165, Revised Codes of 1907, and similar statutes considered in the foregoing decisions, and that now visited upon the Act of 1925, as it bases the fee

collectible only upon the intrastate business of foreign corporations coming into the state. The Act is therefore valid and operative. (*J. I. Case Co.* v. *Stewart,* above; *People ex rel. D. W. Griffin Co.* v. *Commission,* above; *New York* v. *Latrobe,* above.)

The Act now under discussion does not take into consideration no par value stock which, under the Act of 1925, is accorded a set value—a provision declared "arbitrary, discriminatory and invalid" in *Air-Ways Corp.* v. *Day,* above, and *O'Gara Coal Co.* v. *Emmerson,* above—but deals only with issued shares of stock representing the entire capital stock of the corporation. In passing, however, it should be noted that section 5 of the Act, quoted above, is unconstitutional in respect to corporations engaged in interstate commerce, as the state cannot exclude such corporations from coming into the jurisdiction. (*North American Petroleum Co.* v. *Hopkins,* 105 Kan. 161, 181 Pac. 625; *State* v. *Sullivan,* 282 Mo. 261, 221 S. W. 728.)

The report of plaintiff corporation on which the computation of the fee exacted herein is based shows that plaintiff's "authorized" capital stock consists of 2,923,804 shares of preferred stock of a value of $100 per share, and 2,097,971 of "no par common stock," and that its issued and outstanding certificates represent 1,191,750 shares of the preferred stock, valued at $100 per share, and 1,174,060 shares of common stock valued at $1 per share. The report further shows that the proportion of plaintiff's capital stock employed in this state, computed in accordance with the provisions of section 3 of the Act, is 9.29 per cent thereof.

Section 1 of the Act fixes the rate on which the fee is to be computed at $1 per thousand for the first $100,000 of "capital stock"; $.80 per thousand for any additional amount up to $250,000; $.60 per thousand on additional amount up to $500,000; $.40 per thousand on additional amount from $500,000 to $1,000,000; and $.20 per thousand on excess over $1,000,000.

The legislative intent that this computation be made on the value of the issued shares of stock is reasonably apparent, and is made clear by the slight, but disastrous, change made in the 1923 Act by that of 1925. The significance of the phraseology used in the Act, and the fact that there may be a wide difference between the value of the capital stock and property of a corporation, is manifest when we consider the distinction between the capital stock and the capital of a corporation. While courts, speaking loosely, have declared that the capital stock is the capital of a corporation on which it transacts business (*Merchants' Co.* v. *Schroeder,* 39 Cal. App. 226, 178 Pac. 540; *Cooper* v. *Utah Light & R. Co.,* 35 Utah, 570, 136 Am. St. Rep. 1075, 102 Pac. 202; *Central Illinois Public Service Co.* v. *Swartz,* 284 Ill. 108, 119 N. E. 990), the capital stock is, strictly speaking, the money contributed by the corporators for which they receive certificates of stock, each share of which represents an aliquot part of the value of the corporation's property and franchises; the *capital* includes this contribution, with all gains or profits realized by its use or acquired from other sources, or, if there are losses incurred, residue after deducting these, and may consist of money, securities and property. (*Burrell* v. *Bushwick R. Co.,* 75 N. Y. 211; *Union Bank* v. *State,* 9 Yerg. (Tenn.) 490; *People* v. *Commissioners,* 23 N. Y. 192; *Christensen* v. *Eno,* 106 N. Y. 97, 60 Am. Rep. 429, 12 N. E. 648.) Thus considered, the value of the capital stock, as evidenced by the shares of stock representing, as they do, aliquot parts of the total value of the assets of the corporation, may differ materially from that of the property owned by the corporation. The value of the property, as reported, may by reason of mortgage bonds and other indebtedness far exceed the value of the assets of the corporation and consequently the value of the issued shares of capital stock.

In computing the fees recoverable, we must therefore take the reported value of the outstanding shares as a basis; 9.29 per cent, the percentage of the capital stock employed in Mon-

tana, of the entire valuation placed on the issued stock of the corporation, gives us $11,180,427.67 as the factor on which the fee is to be computed, which, figured in conformity with section 1 of the Act, results in a fee of $2,606.06, less the fee of $50 already paid, leaving the collectible fee of $2,556.08.

The cause is remanded to the district court of Lewis and Clark county, with direction to modify the judgment by substituting therein the difference between the fee paid under protest and the fee legally collectible, or $5,149.49, for the amount of the judgment rendered of $7,705.57, and, as modified, the judgment will be affirmed. The appellant shall recover his costs incurred on appeal.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.